# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. | 05 CR 879 |
| | ) | Judge Blanche M. Manning | |
| CUONG DANG, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM AND ORDER

On April 26, 2006, a federal grand jury returned a nineteen-count superseding indictment which charged Dang in three counts with conspiring with intent to distribute controlled substances, namely MDMA ("ecstasy") and marijuana in violation of 21 U.S.C. § 946, possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). Cuong Dang moves to quash his arrest and suppress evidence seized from his person and home as well psot-arrest statements made by him. Pursuant to the motion, the court held an evidentiary hearing. For the reasons stated below, Dang's motion to suppress [#51] is denied.

**I.     Facts**

   A.     Donald Wood testimony

The first witness to testify at the hearing was Donald Wood, a special agent with the Drug Enforcement Agency. Wood has been with the DEA for nine years and has participated in over 100 narcotics investigations during that period. The court found him to be a credible witness.

According to Wood, the DEA began an investigation into a group which was importing MDMA (ecstasy) and hydroponic marijuana from Canada and elsewhere into the United States. The investigation began as a result of a cooperating informant (working with the DEA in its Hanoi, Vietnam, and San Jose, California, offices and whom the DEA determined to be reliable), who informed the DEA that certain individuals were delivering wholesale quantities of ecstasy and marijuana into Chicago and other U.S. cities. Based on authorized wiretaps and pen registers on phone numbers provided by the CI, as well as its own surveillance and investigation, the DEA determined that an individual named Thang Van Vu may have been involved in the importation of the ecstasy and marijuana. Indeed, by the end of September 2004, Wood testified that his surveillance and investigation of Vu led him to the conclusion "that Thang Van Vu was an active participant in the drug trafficking organization that we were target[ing]. . . ." Hearing Tr. at 18.

Specifically, the CI cultivated a personal relationship with a high-ranking member of a Vietnamese organization that was importing drugs into the United States, including Chicago. Through his relationship with this high-ranking member, the CI obtained a Chicago-based cell phone number that was involved in the drug ring. According to the CI, he was present during a drug-related conversation between the high-ranking member of the drug organization and the individual to whom the cell phone belonged. Wood was able to corroborate that the information being provided by the CI was truthful and useful.

In July 2004, the Los Angeles DEA office also obtained a Title III wiretap on a telephone number utilized by the high-ranking member's ecstasy distributor, Khoa Dang Pham. The DEA was able to intercept "dirty" phone calls between Pham and the Chicago-based cell phone number referred to previously. The DEA identified the individual with the Chicago-based cell phone

number as Vu through surveillance and records checks and a dropped call.

Wood testified that on October 18, 2004, he had activated the tracking device (which the DEA obtained through court order) on Vu's vehicle, a Toyota Sienna. The device indicated that Vu was driving eastbound on I-94 in Chicago. A team of four or five agents, including Wood, began to follow Vu as he drove down I-94 toward Indiana. Under the team's continuous surveillance, Vu drove to a truck stop just off of an exit for Porter, Indiana. In the parking lot of the truck stop, Vu appeared to make a cell phone call and five or ten minutes later he drove to the back of the truck stop and pulled behind a semi-truck. At this point, Vu was out of the sight of the DEA team, which according to Wood, could not follow him without being detected by Vu. Less then a minute later, Vu pulled out of the truck stop and drove back to Chicago. Wood testified that based on his training and experience, truck stops are locations where drug transactions occur. Tr. at 24 ("The fact that he did not go into a restaurant, stayed in his car, was using his phone and went to an area where semi trucks were parked, it was my opinion, based on what I know, that a drug transaction occurred.").

The team followed Vu back to Chicago where he drove to the 5500 block of North Spaulding. Wood saw Vu drive into the alley and park behind the building located at 5505 North Spaulding. Wood drove around to the front of the address and set up a surveillance of the address while other agents had other positions of surveillance including the alley. An agent surveilling the alley called Wood over the radio and told him that Vu had opened the back of the van and retrieved a large black duffle bag that appeared to be heavy, walked into the backyard of the residence located at 5505 N. Spaulding and placed it in the doorway of the back door of the building. Wood then left his car and walked down the gangway of the building, noted that the

back door was closed and no bag was there and then walked back out to the front of the building. In the front of the building, Wood met up with an agent Zamora who told Wood that another individual had picked up the bag and walked into the building. Wood testified that he and agent were about to knock on the door of the residence when they saw Dang talking on a cell phone and walking in the gangway between the two buildings toward the back of the house.

Wood and Zamora then began walking toward Dang to catch up with him. Dang turned around and when he saw the agents walking towards him, he started walking "briskly" toward the back door of the house. The agents identified themselves as police and told Dang to stop but Dang ran inside the building and locked the door. Wood testified that Dang's failure to stop indicated to him, based on his training and experience, that Dang did not want to be caught and arrested for whatever activity he was engaged in. According to Wood, he could see through a window in the back door that Dang had grabbed the black bag and run down a set of stairs. The agents then forced their way into the common area of the building. The agents came upon another door that was locked that Wood testified appeared to be a door to the basement apartment. Wood was then notified over the radio by the other agents that Dang had run out the front door of the building without the bag. Wood secured the residence by having agents stationed at the front and back doors of the building. Wood testified that he did not enter what he thought was Dang's apartment because he feared that if he forced entry any evidence he obtained would be suppressed.

Wood then went back outside and his thought was either to get a search warrant "and/or" consent to get into the apartment and coordinate surveillance of Vu and Dang. Wood told the agents who were following Vu to stop and arrest him and bring him back to 5505 North Spaulding. Pursuant to Wood's instruction, the agents arrested Vu and brought him back to 5505

N. Spaulding where Wood read him Vu his Miranda rights. Wood asked Vu if he understood what was happening to him, Vu said he did and Wood asked Vu if he would be willing to cooperate with law enforcement by participating in an interview. Vu agreed and while he initially stated that he had not delivered a black duffle bag to 5505 N. Spaulding, he changed his story and told Wood that someone had given him the bag and told him to deliver it to someone else at 5505 N. Spaulding. Wood testified that it was his estimation pursuant to his training and experience that Vu was trying to separate himself from the duffle bag, which Wood believed contained narcotics.

After Wood finished questioning Vu, he went back to coordinating the surveillance of Dang. Specifically, he learned that Dang had driven off from 5505 N. Spaulding at a high rate of speed and the agents were having difficulty following him because Dang was not necessarily following the traffic signs and lights. The agents, however, maintained their surveillance and followed him to a Harris Bank parking lot. The agents told Wood that Dang took a black duffle bag which appeared to be empty out of his car and that he walked into the bank with the bag. The agents reported to Wood that Dang went into the safe deposit box area of the bank and came out with the bag, which now appeared full. Wood instructed the team to approach Dang as he was leaving the bank and attempt to get a consent to search the bag.

The agents told Wood that they conducted a brief interview with Dang who told the officers he had come from the grocery store and that he had gone to the safe deposit box at the bank where he took $80,000 in proceeds from a Marathon gas station that he managed and was going to deposit it in a business account at Harris. The agents also told Wood that they received a consent to search the bag. The search revealed a large sum of money, some cell phones and some

jewelry. Wood testified that Dang's story that he was going to deposit the money in a business bank account at the same time that he was leaving the bank seemed inconsistent and untruthful. Wood instructed the team to arrest Dang and bring him back to 5505 N. Spaulding.

When Dang arrived at the address, Wood testified that he read Dang his Miranda rights and asked Dang if he would cooperate. Dang stated he understood and that he was willing to cooperate. Wood testified that Dang confirmed that he lived alone at 5505 N. Spaulding and that no one else had a key to his apartment. According to Wood, Dang also told Wood that he had a gun in his apartment and when asked if he would grant law enforcement consent to search his apartment, Dang gave both verbal and written consent.

During the hearing, Wood identified the consent form and testified that he watched as Dang signed his name on the consent form. Dang gave the agents the key to his apartment and went into the apartment with the agents. The agents retrieved 130 pounds of gross weight of hydroponic marijuana contained in a black duffle bag in the area next to Dang's bedroom. The agents also found additional marijuana that was found in the closet and a gun that was found in Dang's bedroom. In addition, the agents found packaging material, a money counter, and miscellaneous documents, which Wood testified were consistent with drug trafficking.

After the search, Wood conducted an interview with Dang at his apartment and at the Chicago Police Department. Dang implicated himself in drug trafficking stating that he had participated in trafficking on two prior occasions for which he had been paid. He also stated that he had purchased the gun because he was afraid of Vu, and later admitted that the money at the bank was drug proceeds.

<u>David Zamora</u>

Agent Zamora also testified at the hearing. He is a criminal investigator with the DEA and has been for 4 years. Prior to that, he was with the City of East Chicago, Indiana Police Department and spent 9 years of that time on a DEA task force in Merrillville, Indiana. He estimates he has been involved in 250 to 300 narcotics investigations. The court found him to be a credible witness. Zamora testified that he participated in the surveillance of Vu's Toyota Sienna as it drove along I-94 and at the truck stop in Indiana. According to Zamora, his training and experience led him to believe that the circumstances surrounding Vu's trip to the truck stop were indicative of drug trafficking.

Zamora testified that he followed Vu back to Chicago after he left the Indiana truck stop, saw Vu pull into the alley behind the building at 5505 N. Spaulding, take a black duffle bag out of the Sienna and place it outside the back door of the building located at that address. Just after that, as Vu was walking away, Zamora testified that he saw a person he identified as Dang come out from the doorway, pick up the bag and look toward the alley at the driver of the Sienna. The individual then took the bag inside the building. Zamora then parked his car and began walking toward 5505 N. Spaulding where he met up with Wood. They proceeded to walk toward the rear of the building where the duffle bag had been dropped when they saw Dang walking toward them. Zamora testified that he yelled "police, stop" and Dang ran back inside and locked the door. Wood and Zamora went to the back door and broke it in, but did not enter the locked apartment door to the basement apartment. According to Zamora, Wood told him to wait by the door so that he could speak with the other surveillance agents. Zamora heard from the other agents over the radio that they saw Dang leave the building, get in a car and drive away. Zamora and another agent waited by the apartment door until they learned that consent had been provided to search the

apartment.

Zamora participated in the search during which they seized a firearm and two black duffle bags containing marijuana.

Mike Roache

Illinois State Trooper Mike Roache also testified. Roache stated that he is a canine officer and works with a dog for tracking article searches and doing handgun and narcotics detection. Roache also stated that he has also assisted with federal investigations hundreds of times. On October 18, 2004, Roache was called to assist with the surveillance of Dang at the Harris bank. At the request of agent Nick Pritza, Roache drove his canine truck to Harris bank on Cicero and parked it behind the bank. He could see Pritza standing in the parking lot next to the sidewalk by the front door of the bank. Roache saw an individual come out of the bank and Pritza motioned for Roache to join him, which he did. Roache was in uniform on that day. They both approached the individual who was leaving the bank simultaneously, though at the time Roache did not know who he was. At the hearing, Roache identified Dang as the individual whom they approached.

Roache was present during the conversation between Pritza and Dang in which Prizta identified himself and asked Dang where he was coming from. Dang said he was coming from a grocery store and that he was making a deposit from the weekend earnings at a gas station that he managed. Roache testified that Dang was carrying a bag or a backpack that looked full. Pritza asked for consent to look inside the bag and Dang agreed. Roache and Pritza saw a large amount of U.S. currency inside the bag. According to Roache, Pritza then called Wood and after he called Wood, he informed Roache that they were to arrest Dang. Roache then placed handcuffs on Dang and drove him back to 5505 N. Spaulding. Roache did not mirandize him.

Roache was then asked to do a canine search of the basement apartment at 5505 N. Spaulding. The dog alerted (i.e., scratch in the area where he smells narcotics) as to several bags in the apartment.

The defendant called no witnesses at the evidentiary hearing but filed an affidavit in which he attests that the facts as stated in his motion to quash and the reply are true and correct.

## II. Analysis

The parties agree that the facts are not in dispute and that the constitutionality of the arrest is a question of law. The exact question of law that the court is to consider, however, is not entirely clear. In his motion to suppress, Dang seeks an order suppressing all items of evidence seized from his home *and person* as well as any statements made pursuant to his arrest. However, Dang's argument in his motion and reply seems to be aimed only at the voluntariness of the consent to search his home and not the voluntariness of the consent to search his person at the bank. In the interest of completeness, the court will address both the voluntariness of the search of both his person and his home.

### A. Initial stop and consent to search the backpack

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "When a defendant's motion to suppress raises a Fourth Amendment challenge to a warrantless search, the government bears the burden of establishing legality." *U.S. v. Marzook*, 435 F. Supp. 2d 778, 2006 WL 1735322, at *2 (N.D. Ill. 2006)(citations omitted). Warrantless entry of a person's home is per se unreasonable unless an exception to the warrant requirement, such as voluntary

consent, exists. *Georgia v. Randolph*, 126 S.Ct. 1515, 1520 (2006).

Dang argues that his initial stop by the police at the bank was an arrest that was not supported by probable cause. Therefore, he contends, his subsequent consent to search his backpack and his apartment was not voluntary and the fruits of those searches, including the money, the gun and the marijuana, should be suppressed. *United States v. Cellitti*, 387 F.3d 618, 622-23 (7th Cir. 2004)("Consent given during an illegal detention is presumptively invalid.")(citations omitted). The government argues that the officers' initial stop of Dang was properly based on a reasonable suspicion that the defendant was engaged in criminal activity, and that this *Terry* stop was followed by Dang's voluntary consent.

Courts "have consistently held that officers may conduct an investigatory stop of a person when they have a reasonable, articulable suspicion that criminal activity is afoot." *U.S. v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). As further noted by the Seventh Circuit:

> While "reasonable suspicion" is a hard term to define precisely, the Supreme Court has held that it is a commonsense, nontechnical concept that deals with the factual and practical considerations of "everyday life on which reasonable and prudent [people], not legal technicians, act." But, even though " 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." In other words, reasonable suspicion is less than probable cause but more than a hunch. When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect. Further, we recognize that certain behavior in isolation may have an innocent explanation yet that same behavior may give rise to reasonable suspicion when viewed in the context of other factors at play.

*Id.* (internal citations omitted). "To qualify as a Terry stop, a detention must be limited in scope and executed through the least restrictive means." *U.S. v. Novak*, 870 F.2d 1345, 1352 (7th Cir.

1989). "If a *Terry* stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it ripens into a de facto arrest that must be based on probable cause." *U.S. v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994)(citations omitted).

In the instant case, the totality of the circumstances supports the officer's *Terry* stop of Dang. The officers followed Vu, someone they suspected of being involved in drug trafficking, from Chicago to Indiana, where he briefly stopped at a truck stop without exiting his car. The police continued their surveillance of Vu as he drove from the truck stop in Indiana, where they believed a drug transaction had occurred, back to Chicago. The officers saw Vu drop off a full duffle bag in a doorway which was retrieved by Dang. When the officers approached Dang's building, he began to walk away briskly and subsequently ran back into the building when the police shouted "stop, police." After breaking into the building, Wood learned from his surveillance team that Dang had run out of the front door of the building, jumped into his car and left the area at a high rate of speed. After following Dang, members of the surveillance team saw Dang enter a bank with what appeared to be an empty black bag and then attempt to leave the bank with the same bag fully loaded. These events, viewed through the lens of experienced narcotic officers Wood and Zamora, provided a sufficient basis upon which to conduct a *Terry* stop. *Lawshea,* 461 at 859-60 ("In this case, Lawshea not only ran away from the officer, but he sprinted around the same building three times and refused to stop when Officer McCord twice ordered him to stop. Such flight gave Officer McCord reasonable suspicion to conduct a Terry search."). According to the officers, Dang was asked for consent to search his bag immediately (or at least very soon after being stopped) and he agreed.

Dang asserts that he was "searched, handcuffed and placed in the rear of a police vehicle –

circumstances amounting to a de facto arrest." Motion at 3, ¶6. Whether or not Dang was ultimately arrested, however, does not negate the propriety of the initial *Terry* stop and the subsequent consent to search his backpack. Specifically, Roache contends that Dang was asked for consent to search his backpack containing the large amount of money *before* being handcuffed and placed in the police car and Dang does not appear to challenge these factual assertions. Indeed, Dang's only version of the facts comes through an affidavit attached to his reply brief in which he attests to the facts as set forth in his opening motion to suppress and the reply in support. However, the only facts set forth in these documents as to what occurred at the bank are that the "[o]fficers stopped Dang as he was leaving the bank, questioned his whereabouts, and searched his backpack." In his reply brief, Dang asserts that he cannot recall whether he provided consent. These facts do not contradict the government's version of events and indeed support it.

Thus, as to the search of Dang's backpack and personal items at the bank, the court finds that the *Terry* stop was proper and that Dang gave his voluntary consent for the officers to conduct such a search.

B. <u>Validity of Dang's arrest and subsequent search of residence</u>

According to Woods' testimony, the officers searched Dang's backpack at the bank during which time they retrieved a large amount of cash, some cell phones and some jewelry. At this time, Wood admits that he instructed the officers at the bank to arrest Dang and then bring him to 5505 N. Spaulding. Roache's testimony is consistent with this statement. Thus, the government does not deny that it arrested Dang at the bank. After Dang arrived at 5505 N. Spaulding, Wood testified that he read Dang his Miranda rights and asked if he was willing to cooperate and Dang agreed. Thus, the court need not find that a de facto arrest occurred as the government concedes

that it arrested Dang.

Dang, however, argues that the arrest was not supported by probable cause. If that is the case then any consent given after the illegal arrest was invalid.

As noted by the Seventh Circuit:

> The Fourth Amendment protects citizens against unreasonable arrests. For a warrantless arrest to be reasonable, law enforcement agents must have probable cause, which exists if, given the facts and circumstances within their knowledge at the time of arrest, the agents reasonably believed that the suspect had committed or was committing a crime. Determinations of probable cause are naturally based on probabilities, and a finding of probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." In making probable-cause determinations, law enforcement agents are entitled to draw reasonable inferences from the facts before them, based on their training and experience.

*United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003)(citations omitted).

As noted above, prior to the events of October 18, 2004, the government's investigation led it to believe that Vu was involved in drug trafficking. The government's CI in Asia had provided evidence, which the government corroborated, of Vu's participation in an organization involved in importing ecstacy and marijuana. The CI provided a telephone number related to drug trafficking activity which the government confirmed through pen registers, Title III wire intercepts, and cell site data, was Vu's phone number. Moreover, federal agents had seen in plain view in Vu's car telephone numbers which they knew through Tittle III intercepts to be related to drug trafficking activity. Finally, Vu had had phone contact with an individual who was arrested in September in possession of 18,000 ecstacy tablets.

On October 18, 2004, the agents followed Vu as he drove from Chicago to a truck stop in Indiana and, after making what appeared to be a short cell phone call, pulled behind several semi-

trucks in a remote area of the truck stop. One minute later, the agents saw Vu drive out of the parking lot without ever having gotten out of his car, and followed him back to Chicago to the residence at 5505 N. Spaulding. Both Wood and Zamora, experienced narcotics investigators, testified that Vu's activities were indicative of drug trafficking. *Id*. at 586 ("Such expertise is highly significant because, as one commentator has noted, officers assigned to 'specialized areas of enforcement, become familiar with the methods of those engaged in particular types of criminal activity,' giving them an ability to detect unlawful activity where laymen might not.")(citations omitted).

Upon Vu's return to Chicago, Wood and Zamora watched him drop a black duffle bag at the door of 5505 N. Spaulding, which Dang retrieved. When the agents approached Dang and identified themselves, he fled back into the building, ditched the duffle bag in his apartment, ran out the front door of the building, and drove to the bank at a high rate of speed in an erratic manner.

Wood testified that his suspicions were further aroused when, during his conversation with Vu while Dang was driving to the bank, Vu tried to distance himself from the black bag:

> Wood: [Vu] said he understood, and that he wished to cooperate with law enforcement.
> Q: After that point did you have a conversation with him?
> Wood: Yes.
> Q: What did you say to him and what did he say to you?
> Wood: I asked what was in the black duffel bag that he delivered to 5505 North Spaulding.
> Q: What did he reply?
> Wood: He stated that he did not deliver a bag to 5505 north [sic] Spaulding.
> Q: What did he [sic] say to him after that?
> Wood: I then informed him that we were surveilling the area and that we observed him take a black duffle bag out of his car and bring it to 5505 north [sic] Spaulding and deliver it to the gangway, to the

Page 14

| | |
|---|---|
| | common – the back of the house. |
| Q: | After you informed him that you had seen him with a black duffle bag did he have a reply? |
| Wood: | Yes. |
| Q: | What did he say then? |
| Wood: | He stated that yeah, that he did deliver a black bag to 5505 north [sic] Spaulding, and that some guy had given [him] the bags [sic] and told him to give it to another guy at 550 north [sic] Spaulding. |
| Q: | So he changed his story, is that fair ? |
| Wood: | That is fair. |
| Q: | And based on your training and experience, did your interaction with Thang Vu give rise to an opinion on your part as to whether he was telling the truth. |
| Wood: | Yes. |
| Q: | What was your – based on you having been at the scene, what did you think at that point? |
| Wood: | His first statement is that he lied, and then it was based on what [sic] my training and experience that he was trying to separate himself from the back bag, which I believed at that time contained narcotics. |

Tr. at 39-40. Wood then testified that it is "typical" for arrestees to separate themselves if narcotics are involved. Thus, Vu's contradictory answer regarding whether Vu had dropped off the black duffle bag further supported the probable cause to arrest Dang, who had retrieved it. *United States v. Reed*, 443 F.4d 600, 603 (7th Cir. 2006)(stating that the totality of the circumstances supported a finding of probable cause where, "[a]t the time of the arrest, the officers knew that the three men had traveled from outside the state, but were evasive and contradictory as to the nature of their trip," among other things). In addition, before being arrested, Dang told the agents who stopped him that he had come from the grocery store, which the agents knew to be false given that they had followed him from 5505 N. Spaulding. Thus, prior to arresting Dang, they had false statements from both Vu and Dang. Moreover, prior to Dang's arrest and pursuant to a valid *Terry* stop, Roache and Pritza had obtained Dang's consent to

search his backpack, which contained over $80,000 in cash. *Id.* at 603 (stating that the assertion that the presence of a large sum of money was irrelevant to the probable cause determination is "untenable" and that "although the existence of the large amount of cash . . . does not alone establish probable cause, it is a relevant circumstance that must be considered along with all aspects of the situation confronting the officers.").

Nor were there any innocent explanations for the events observed by the officers on October 18, 2004 and Dang offers none. *Funches*, 327 F.3d at 578 ("Of course, the mere existence of innocent explanations does not necessarily negate probable cause, but considering innocent, alternative explanations is often helpful.").

Accordingly, based on the information the government had about Vu's connection to drug importation prior to the events of October 18, 2004, Vu's trip to the Indiana truck stop and delivery of the black duffle bag to 5505 N. Spaulding, Dang's immediate retrieval of the bag, his subsequent concealment of the bag and flight from the building when approached by agents, his erratic and high-speed drive to the bank, his lie to Roache and Pritza about where he had just come from, and the over $80,000 in cash in his backpack, the court concludes that the government had probable cause upon which to arrest Dang. As such, Dang's subsequent consent to search his apartment was valid, and any fruits of the search, including incriminating statements made by Dang, will not be suppressed.

## III. Conclusion

For the reasons stated herein, Dang's motion to suppress [#51] is denied.

**Date: March 7, 2007**

_____
**Blanche M. Manning**
**United States District Judge**